## SHEEHAN v. HUDMAN.

### No. 2661.

Court of Civil Appeals of Texas. El Paso.
April 21, 1932.

Rehearing Denied May 12, 1932.

Mead & Metcalfe, of Marfa, for appellant.

John Perkins, of Alpine, for appellee.

WALTHALL, J.

On December 13, 1927, J. F. Hood executed and delivered to Sheehan & Co. a promissory note for $1,000, due and payable 30 days after date with interest at 10 per cent. per annum, with 10 per cent. attorney fees if placed in the hands of an attorney for collection. Prior to the making of the above note, to wit, on March 17, 1927, Sheehan & Co., by an agreement in writing, for a consideration of $1 paid, and a further consideration of $2,043.50, with interest, the sum evidenced by certain notes payable in monthly installments as stated, leased to J. F. Hood one Acme Trailing crusher and other machinery described, under the terms fully stated in the agreement, Hood personally obligating himself for the consideration stated, and other matter stated.

The record shows that default was made by Hood in the payments of some of the above obligations.

Sheehan & Co. was a trade-name used by J. P. Sheehan, he being the sole owner of the business and the sole owner of the notes and especially of the $1,000 note involved here.

On September 25, 1931, J. P. Sheehan filed herein his first amended original petition upon which this suit is prosecuted. Sheehan sues W. F. Hudman and G. P. Armstrong, and as a basis for his recovery the petition alleges the execution and delivery to Sheehan of the Hood note for $1,000 above stated, its extension from time to time as provided in the note.

The petition alleges that: "At the time of the execution of said note the said J. F.

Hood, who executed said note, and the defendant Hudman herein were partners in the operation of a contract and a contemplated contract for the construction of certain road work at or near Monahans, Texas, which said work at the time of the execution of said note and subsequent thereto was being jointly done by the said Hood and the said Hudman as co-partners, they agreeing among themselves to share in the profits therefrom, if any, jointly, and to be responsible for the obligations of said operation, if any, jointly; and said Hudman held himself out to this plaintiff as a partner therein; and the consideration stated in said note as moving from plaintiff to the said Hood and to the said co-partnership, was for certain machinery leased and purchased by the said Hood from this plaintiff and said note was given as part payment for said machinery and for rental and lease thereof which was to be used by the defendant Hudman and the said J. H. Hood in such joint enterprises, for the mutual benefit and profit of the said Hudman and the said Hood; and this plaintiff says that the consideration therefor being for the benefit of the joint enterprise of the said Hudman and the said Hood, and the said Hudman being a partner in the operation of said business with the said Hood, the said Hudman is bound and obligated to this plaintiff for the sum of money stated in said note, together with interest thereon as therein provided and attorney fees as specified in said note."

Petitioner then sues in the alternative and alleges that if Hudman was not a partner with Hood, prior to the execution of said note, at the time and subsequent to its execution, for a good and valuable consideration, he orally agreed to pay said note.

Sheehan dismissed his suit as to Armstrong, and we need not state his pleading as to him.

Hudman pleaded a number of exceptions, but none of them were passed upon by the court, and we need not consider them. Hudman specially denied that he signed or executed said note, and denied that any one was authorized to execute it for him, and further that said instrument (in reference to the lease of said machinery) was made without his knowledge or consent; and that since its execution he has not ratified it nor agreed to pay it.

Hudman specially denied any partnership relation between him and Hood, as alleged; denied that Sheehan leased or sold to Hood for him any machinery or that such machinery was to be used jointly by him and Hood, as alleged; specially denied that he agreed or assumed to pay said note; denied that he ever received any consideration, good or valuable, from Sheehan to pay said note; denies that prior or subsequent to the 13th of December, 1927, he was then engaged in road

work in which he could use the machinery sold by Sheehan to Hood, or that said machinery was specially adapted to use in any work he was doing or contemplated doing, or that said machinery and equipment would be of any value to him; denied he advised Sheehan that if he would not repossess said machinery from Hood and would permit him (Hudman) to use said equipment on such road work that he (Hudman) would pay $1,000 of said indebtedness against Hood, as represented in said note.

Hudman alleges at length that he did make certain conditional promises to Sheehan with reference to Hood's indebtedness, but same being only in explanation, and not in qualification or defensive of any matter alleged by Sheehan, we need not state it.

■ Sheehan answered by exceptions, repleading certain matters formerly pleaded, general denial, alleged that the statute of frauds was not involved, and other matters not necessary to state. The trial court did not pass on the exceptions and they were thereby waived.

The case was submitted to the court without a jury, and after hearing the evidence the court sustained Hudman's motion for judgment in his favor. No findings of fact were filed. Sheehan prosecutes this appeal.

## Opinion.

Sheehan contends that the evidence shows that at the time and subsequent to the execution of the note sued upon Hudman and Hood were partners, and that the note was given on behalf of and for the benefit of the partnership.

To sustain the judgment on the facts the trial court necessarily held the opposite to Sheehan's contention.

There is no evidence in the record tending to show that at the time Hood executed the note to Sheehan, or leased or purchased the machinery from Sheehan, Hudman was present or took any part in either of the transactions. His name does not appear in or on the note, nor does his name appear on nor is there any reference to him or to a partnership in the lease or purchase agreement as to the machinery; such transactions, on the face of the note and the lease agreement, were wholly between Sheehan and Hood.

Briefly stated, the evidence shows substantially the following:

Sheehan testified that early in 1927, "we sold Mr. Hood a crusher and a screening plant for use on a road contract that he had." The witness identified the lease agreement and it was admitted in evidence. That transaction was in March, 1927. There was default in the monthly payments provided for in the lease agreement. Without copying the evidence in full, the salient facts are substantially as follows:

Armstrong & Armstrong had a contract with the state highway department for certain road construction near Barstow, Tex. Armstrong & Armstrong sublet their contract to Hudman, and Hudman, in turn, sublet a part of his contract to Hood. On March 17, 1927, Sheehan sold the machinery mentioned to Hood on the credit or terms in the lease agreement to be used by him on his subcontract on that job. In October, 1927, in company with Vick Winter, Sheehan went to Hood's camp near Barstow and demanded of Hood the money then due under the lease agreement, or the possession of the machinery. Hudman, at that time, was at Hood's camp. Hood was at work on his contract and was using the machinery. A conversation occurred with Sheehan, Winter, Hood, and Hudman present. According to Sheehan, Hudman said: "We can't let this equipment (machinery) leave this job. This job has some thirty days or six weeks more before completion and this is the only crushing plant on this job. This equipment has just got to stay on this job." Sheehan, not quoting the words of Hudman, said Hudman further stated that he and Hood at the completion of this job were going to bid in a contract they had already looked over, and was being considered at that time between Grand Falls and Monahans; it was a crusher job, slightly in excess of 12,000 yards of crush, caliche. Sheehan showed the lease contract to Hudman covering the equipment. Hudman said: "There is no use to show it to me. I know just what that contract is, and I know that Hood is behind in his payments." Sheehan said: "Hood tells me that he hasn't any money to pay this indebtedness." Hudman says: "He talked to me and we have worked out a plan that I think will satisfy you." Sheehan said: "Mr. Hudman then proposed to me a basis on which I would leave the crusher. He said they had to have the crusher to finish the work that he had contracted for and it would take another month to complete it. * * * This job about 12 miles from Monahans is going to take us about four months to do and we are practically certain of getting it. We can pay you $250.00 a month if you will permit this crusher to finish this job here, and to be used on the Grand Falls-Monahans job by the month, and I will pay this $1000.00 balance on it. He said that he would pay that out of the final estimate on the Barstow job. It was a State Highway contract let in Austin to Armstrong. He sublet that job to Hudman in part, * * * and Hudman sublet either all his stuff or a part to Hood." In answer to a question as to what was the conclusion of the conversation between the three, Sheehan said that he refinanced the contract with Hood, as suggested by Hudman, by the execution by Hood of the note sued on, of date December 13th, in the sum of $1,000. Sheehan said Hudman said he would pay and would guarantee

the payment of the $1,000, but that he would not sign the note.

Vick Winter, salesman for Sheehan & Co., testified: "We asked Mr. Hudman to give us an order on Armstrong & Armstrong for this ($1,000.00) which he refused to do; he said he would pay $1,000.00 of it but would give no order as his word was good."

J. F. Hood testified. Said: 'Was a subcontractor under Hudman. He executed the contract with Sheehan of March 17, 1927, for the purchase of the machinery. It was used in October, 1927, on the job, a grade and caliche surfacing. His relation to Hudman was that of 10,000-yard subcontractor. The equipment used was suitable for road work. His pay was a fixed price contract. In October, 1927, witness had not made payments with Sheehan on the equipment purchase contract; there was then delinquent $2,100. In October, 1927, Sheehan and Winter came to my camp at Barstow, as he supposed to repossess the crusher equipment. After that time witness went into negotiations with Winter, Sheehan, and Hudman with reference to this equipment. Sheehan said if he was not paid he would repossess the crusher. Hudman said: "The job is pretty well completed and that he didn't want to see the equipment moved that late in the job, and, that he would like to see it stay there until the job was completed and that he would pay the $1,000.00 on this crusher out of the final estimate." Witness said on the future Monahans job: Hudman and he were reasonably certain of getting the job, and they did. Hudman said, in the conversation, that we would use this same equipment we had on the next (Monahans) job. Hudman, witness, and George Finley, division engineer, looked the job over and discussed the specifications. Witness and Hudman moved the equipment on the job after they got it, and used it; it was necessary to use the equipment. Witness had an understanding with Hudman as to how the estimates on the (Monahans) job were to be handled and to whom they were to be paid; the estimates were drawn monthly; Hudman signed them; the checks were made payable to him; he handled the money through the bank and paid the expenses on the job; witness attended to paying some of the expenses, and for that received checks from Hudman. Trucks were used on both jobs. Witnesses bought the trucks, "except for some trucks that were hauled under contract; I believe they belonged to Hudman. The trucks were working on that job (Barstow) and then they were moved to Monahans." Witness took the trucks to the Barstow job. A foreclosure sale of the trucks was had and Hudman bought them in. They were then moved to Monahans. Witness and Hudman made a joint bid on the Monahans job. Witness was to do the job with the equipment he had for 85 per cent. and Hudman was to

take 15 per cent. Hudman had no equipment on the job. The estimates (on the Monahans job) were paid to Hudman, and Hudman "paid you (witness) 85% and from that you (witness) were to pay everything and get your profit; that was the basis of the agreement, was it?" Witness answered: "Yes, sir." Witness and Hudman finally settled on the basis of witness getting 85 per cent. and Hudman 15 per cent. of the estimates, on the Monahans job. Hudman said, in the conversation in October, that: "He would pay it (the $1000.00) out of the money that he was holding at the finish of the job, or rather on the final estimate, when it was paid by the state. He said he would pay it out of that.

"Question: To be charged to you? Answer: Yes, sir.

"Question: It was your debt? Answer: Yes, sir."

Witness said he was to get about $2,000 for "this shooting," and that Hudman was to pay witness $1,000, and the other $1,000 was to be paid to Sheehan & Co. Sheehan also testified that Hood had $2,000 extra coming to him on the Barstow job for shooting; that Hudman told him (in the October conversation) that he would pay this $1,000 on receipt of the final estimate from Armstrong & Armstrong; that it was already earned and was already charged to Hood. Witness did not know whether the $2,000 for the "shooting" had been paid by the state.

We have stated of the evidence only extracts, and only what seems to be sufficient to make clear the question of Hudman's liability to Sheehan for the $1,000 evidenced by the note sued on, whether as a partner with Hood or as an independent promisor.

■ It seems clear to us that under the evidence no partnership existed between Hood and Hudman as a matter of law at the time of the creation of the debt as alleged in the first count of the petition. It was Hood's debt from the beginning. In the refinancing under the conversation had in October at Hood's camp, the same indebtedness was carried forward and put in the note of 13th of December, 1927, and signed only by Hood. So that from the beginning to the close of the negotiations it was Hood's indebtedness. It seems to us that the most that could be said of it is that Hudman agreed, with Hood's consent, that he would pay the $1,000, evidenced by the Hood note, out of the estimates on Hood's subcontract on the Barstow contract, the estimates due or to become due Hood on the blasting or "shooting." That blasting or shooting estimate seems to have been extra and under Hood's subcontract, and the evidence does not show that such estimate had been paid by the state. All estimates were paid by the state through Armstrong & Armstrong, the original contractors on the work, under the state highway department. There being no findings in the record by the court, every reasonable presumption will be indulged in support of the judgment, and we must assume that the court found all controverted issues of fact in such manner as will sustain the judgment rendered. There is no evidence in the record as we read it that Hudman held himself out to Sheehan as a partner in a partnership with Hood, nor is there in the record evidence that Sheehan extended any credit to Hood and Hudman as a partnership, but the extension of the time of payment under the refinancing of the Hood indebtedness in October seems to have been done on Hudman's promise to pay $1,000 of the Hood indebtedness. The judgment could be sustained, we think, on the evidence that Hudman was to make such payment out of the estimate that was or would be due Hood on his subcontract on the blasting or shooting. If such was the agreement of Hudman, the note not being his note, or signed by him, and he having obligated himself only to pay it out of Hood's special fund, as stated, his liability would not extend beyond his undertaking. The burden would be on Sheehan to plead and prove the happening of the conditions that make Hudman liable.

■ The issue of partnership, however, is immaterial. No one is chargeable on a promissory note unless his name appears as a party to it in some relation. This is true under the law merchant as well as the Negotiable Instrument Law. Article 5932, § 18, R. S.; T. L. & Co. v. Carroll, 63 Tex. 51; Sanger v. Warren, 91 Tex. 482, 44 S. W. 477, 66 Am. St. Rep. 913. Person v. Katz, 47 S.W.(2d) 657, recently decided by this Court.

■ The note is simply signed by Hood, and there can be no recovery thereon against Hudman even if they were partners and the note was given for a partnership debt.

■ The promise of Hudman to pay the Hood note of $1,000, being based upon a sufficient consideration to Hudman, subdivision 2 of article 3995, of our Civil Statutes, relating to fraud and fraudulent conveyances, has no application.

There being no findings of the court and nothing to indicate the ground upon which the judgment is based other than is suggested in Hudman's motion for judgment, to the effect that the evidence under Sheehan's pleading was not sufficient to sustain a judgment against Hudman, we must assume the court reached the conclusion, as was reasonable, that Hudman was to pay the note out of Hood's estimate coming to and through him from Armstrong & Armstrong for the shooting, when paid by the state, and that the pleading not having alleged that such estimate had been paid, and the evidence not showing that fact, Hudman was not liable.

In our opinion the debt sued on was never a partnership debt. It may be, as suggested by Sheehan, that a partnership was entered into by Hudman and Hood subsequent to the making of the note, and subsequent to Hudman's promise to pay the note, in the Monahans and Grand Falls work, but the evidence would well justify the judgment on the theory that Hudman was to discharge the note out of the Barstow estimate to Hood, as above, and that the note was never subsequently made a partnership indebtedness by any action of the partners. The case is purely a fact case.

The case is affirmed.